**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-1084

KENNETH ESPINOZA,

     Plaintiff,

v.

HENRY TRUJILLO, a Las Animas County Sheriff Deputy, in his individual capacity,
MIKHAIL NOEL, a Las Animas County Sheriff Deputy, in his individual capacity,
REY SANTISTEVAN, Las Animas County Undersheriff, in his individual capacity,
SHERIFF DEREK NAVARETTE, Las Animas County Sheriff, in his individual capacity,
LAS ANIMAS COUNTY BOARD OF COUNTY COMMISSIONERS, and
LAS ANIMAS COUNTY SHERIFF'S DEPARTMENT

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

     Plaintiff Kenneth Espinoza, by and through his attorney Kevin Mehr of Mehr Law PLLC,

respectfully alleges for his Complaint and Jury Demand as follows:

**<u>INTRODUCTION:</u>**



1. Las Animas County Sheriff's Deputies, posing with their guns, posted on the Department's public Facebook page circa 2019, Defendant Henry Trujillo pictured top row, center.

**PARTIES:**

2. Plaintiff, Mr. Espinoza is and was at all times mentioned a resident of Colorado.

3. Defendants Trujillo ("Trujillo") and Noel ("Noel") are, and at all times mentioned, residents of Las Animas County, Colorado, as well as agents acting on behalf of the Las Animas County Sheriff's Department ("LACSD") in Colorado.

4. Defendant Derek Navarette ("Navarette") is and was at all times relevant the elected Sheriff of Las Animas County, Colorado and is and was a resident of Colorado.

5. Defendant Rey Santistevan ("Santistevan") is and was at all times relevant the Undersheriff of Las Animas County, Colorado and is and was a resident of Colorado.

6. Defendant Las Animas County Sheriff's Department is a municipal agency of the Las Animas County government, with its main office located at 2309 E. Main Street, Trinidad, CO 81082, and is considered a "person" subject to suit under 42 U.S.C. § 1983.

7. Defendants Navarette and LACSD are responsible for the oversight, supervision, discipline and training of LACSD officers, including Trujillo and Noel.

8. Defendant Board of County Commissioners of Law Animas County ("Board") is an administrative and policy making body for Las Animas County as delegated by the Colorado General Assembly, with its main office located at 200 E. 1st Street, Trinidad, CO 81082.

9. The Board is responsible for establishing policies for Las Animas County agencies, including LACSD, as well as responsible for oversight of government services, including LACSD's.

## JURSIDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States and is brought through 42 U.S.C. § 1983, and the Constitution of the State of Colorado through C.R.S. § 13-21-131.

11. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 because, as is shown more fully in this Complaint, Plaintiffs' claims arise under the Constitution and laws of the United States.

12. Jurisdiction over Plaintiff's pendent state law claims is proper under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims arising under federal law that they form part of the same case or controversy.

13. Venue is proper in the United States District Court for the District of Colorado pursuant to both 28 U.S.C. § 1391(b)(1) and (2). Specifically, venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado. Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the events and omissions giving rise to this litigation, all of the Defendants resided in Colorado, the state in which the District of Colorado is located.

## RECITATION OF FACTS

14. On November 29th, 2022, Kenneth Espinoza was driving down Main St. in Trinidad, CO. His son, Nathaniel Espinoza, was traveling in a different vehicle in front of Mr. Espinoza. At around 4:30 PM, Nathaniel Espinoza was contacted and pulled over by Defendant Mikhail Noel for an alleged traffic violation. As Mr. Espinoza and his son were traveling to the same destination, Mr. Espinoza circled the block and then pulled off the side of the road and

parked approximately 75 feet behind Defendant Noel's patrol vehicle to wait for his son. Mr. Espinoza was legally parked on the shoulder of the road.

15. As Mr. Espinoza waited and observed the traffic stop from this distance, Defendant Henry Trujillo, arrived to assist in the traffic stop. But rather than do that, Defendant Trujillo made contact with Mr. Espinoza, who was still in his truck. Defendant Trujillo ordered Mr. Espinoza to leave the area, despite that fact that Mr. Espinoza explained he was only waiting for his son. Defendant Trujillo repeatedly ordered Mr. Espinoza to leave the area, until Defendant Noel walked from his patrol car back to Mr. Espinoza's truck. Defendant Noel told Mr. Espinoza to leave the area as well.  Mr. Espinoza had committed no crime or traffic infraction and was in no way interfering with the traffic stop involving his son.  Defendants had no reason or legal authority to order him to move his truck, as it was legally parked and Mr. Espinoza was doing absolutely nothing wrong. In response to Defendant Noel's command, Mr. Espinoza put his truck in Drive and began to leave.

16. Then, as Mr. Espinoza's truck began to move forward, Defendant Noel yelled for Mr. Espinoza to stop. Defendant Noel gave this command *less than one second* after demanding that Mr. Espinoza leave the scene.  Defendant Noel then inexplicably grabbed for the door handle of the moving vehicle and attempted to operate the mechanism and open the door. Once his hand slipped off the door, he tried again multiple times. Upon not being able to grasp the door handle, Defendant Noel then grabbed his pistol and pointed it directly in Mr. Espinoza's face, screaming at Mr. Espinoza to get out of the car. Defendant Noel pointed his pistol at Mr. Espinoza's face less than *three seconds* after screaming at him to leave the scene.



17. Despite having a firearm pointed at him and an irate officer screaming in his face, Mr.

    Espinoza calmly backed his truck off the street next to Defendant Trujillo's vehicle. As Mr.

    Espinoza re-parked his truck, Defendant Trujillo ran up to him, gun drawn, and began

    screaming for Mr. Espinoza to get out of the truck.



18. Defendant Trujillo grabbed Mr. Espinoza's left arm through the open window and violently

    wrenched it backward, while Defendant Noel entered the vehicle from the passenger side.

    Defendant Noel, who had holstered his firearm and drawn his Taser, then began to administer

repeated "Drive Stuns" to Mr. Espinoza's backside while attempting to shove him out of the vehicle. Noel tased Mr. Espinoza approximately 15 times while he was still in his truck.



19. Mr. Espinoza was then forced from his vehicle and handcuffed where Defendant Noel tased him approximately 15 more times in the back while he was handcuffed.  Once Mr. Espinoza was in handcuffs, Defendant Trujillo moved Mr. Espinoza to his patrol vehicle. Defendants opened the rear passenger door and shoved Mr. Espinoza into the vehicle while screaming at him to "get in the car". Mr. Espinoza had difficulty getting into the backseat of the patrol car as he is a larger individual, was handcuffed behind his back, and was being shoved by two officers. Without giving him an opportunity to comply, or any actual assistance into the vehicle, Defendant Noel again drive stun tased Mr. Espinoza, tasing him approximately 7 more times. These painful stuns caused Mr. Espinoza to turn and face the Defendants, at which point Defendant Trujillo stepped back and fired his Taser at Mr. Espinoza's face, striking him in the lip with one barb, and the chest with the other. Defendants then shoved Mr. Espinoza into the back of the patrol car, and slammed the door on Mr. Espinoza's leg before shutting it.

Defendant Noel's taser use:



Defendant Trujillo's taser use, simultaneous to Defendant Noel's:



20. Moments later, Defendant Trujillo opened the door to attempt to gather information from Mr.

   Espinoza. Mr. Espinoza understandably no longer wished to cooperate with the questioning

   by Defendant Trujillo as Trujillo had just brutalized him. Angered by Mr. Espinoza's choice

to exercise his right to remain silent, Defendant Trujillo violently grabbed Mr. Espinoza and

drug him out of the patrol vehicle, still handcuffed, slamming Mr. Espinoza to the icy

pavement on the back of his head, while threatening Mr. Espinoza with "additional charges"

for Mr. Espinoza's non-compliance.



21. Finally, just prior to transport of Mr. Espinoza Defendant Trujillo intentionally deactivated

his body camera, in violation of Mr. Espinoza's rights, LACSD policy 1212, and state law.

Defendant Trujillo did not activate his body camera at any time during transport of Mr.

Espinoza. An ambulance arrived on scene to take Mr. Espinoza to the hospital to have the

taser probes removed from his mouth and be medically cleared to go to jail.  Mr. Espinoza

requested to ride with them, however Trujillo refused and insisted that he be the one to

transport Mr. Espinoza.  Alarmingly, Trujillo did not take Mr. Espinoza to the hospital, but

first took him to the Las Animas County jail.  While enroute to the jail, Trujillo called, on his

personal cell phone, other members of the LACSD to tell them to "get the chair ready, we're going to fuck this guy up." (Meaning to prepare a 'restraint chair' for Mr. Espinoza, something only to be used with actively violent arrestees). When Trujillo removed Mr. Espinoza from the patrol car, he made various threatening statements to Mr. Espinoza such as "Do you think this uniform is a fucking costume? Do you think I'm just dressing up for Halloween?" The ambulance arrived at the jail at the same time as Trujillo and Mr. Espinoza and the medical personnel asserted to Trujillo that Mr. Espinoza must be taken to the hospital before he could be admitted to the jail.  Again, out of fear for what else Trujillo may do to him, Mr. Espinoza requested that the ambulance transport him to the hospital, but Trujillo again refused to allow that and demanded that he transport Mr. Espinoza himself. This removal of Mr. Espinoza at the jail and re-entry into Trujillo's patrol car is corroborated by the limited body camera that does exist, showing Mr. Espinoza transported from the scene on the passenger side of Trujillo's patrol car, and then he is removed from the driver's side when he exits to walk into the hospital.

22. The only footage of Mr. Espinoza at the hospital were a few photos of his lip injuries, taken by hospital staff:



23. Defendants Trujillo and Noel violently and without justification assaulted Mr. Espinoza on November 29th, 2022. Mr. Espinoza was simply an innocent bystander, waiting for his son while a traffic stop was conducted. He was legally parked well away from Defendant Noel's vehicle and was not interfering. There was no real or apparent threat to the officers. Both Defendants escalated and caused this situation, acted violently and unlawfully, and then wrote minimized and/or falsified statements as to what occurred during the encounter with Mr. Espinoza.  A crime for which Mr. Espinoza could legitimately be suspected of committing when Defendants began assaulting him cannot be articulated. Defendants individually and collectively violated internal law enforcement policies, state law, and Mr. Espinoza's Constitutional rights.

24. Mr. Espinoza was arrested and charged with various offenses, including resisting arrest and assault on a peace officer, in Las Animas County case 22CR197. On December 6th, 2022, this criminal filing was dismissed by the District Attorney's Office, and the record sealed by the court. Mr. Espinoza spent one day in jail as a result of this flagrant violation of his

constitutional rights.  Mr. Espinoza was forced to pay impound fees for his truck, bond to be released from jail, a retainer for legal defense of these falsely brought charges, significant repair bills for the damage to his truck, and continues to pay for therapy for himself and his son in treatment for the trauma inflicted by Defendants.

25. Plaintiff brings this action against all defendants for violations of his rights secured in Article II of the Colorado Constitution, pursuant to C.R.S. § 13-21-131, the United States Constitution pursuant to 42 U.S.C. §1983, as well as Colorado constitutional and statutory violations pursuant to C.R.S. § 18-1-707 and § 24-31-902.

## **FALSE AND/OR MINIMIZED STATEMENTS BY DEFENDANTS CONTRADICTED BY BODY CAMERA**

*Defendant Noel fabrications:*

26. Both Trujillo and Noel wrote police reports related to this encounter with Mr. Espinoza on November 29th, 2022. Defendant Noel even filed a sworn Affidavit of Probable Cause for a Warrantless Arrest ("APC"), which included false claims to support this illegal contact, detention, and arrest. However, once the matter was reviewed by the District Attorney's Office, the case was immediately dismissed due to the outrageous nature of the contact and behavior of the named Defendants.

27. For example, in the aforementioned APC, Defendant Noel stated that he "observed a white pickup [Mr. Espinoza's vehicle] approximately 5 feet behind my marked patrol car", suggesting that Mr. Espinoza had pulled up directly behind Noel's patrol vehicle. However,

Noel's body camera clearly shows him walking 25 paces past his own patrol car before he arrived at Mr. Espinoza's truck. Assuming 2-3 feet/pace, Defendant Noel walked at least 50-75 feet to Mr. Espinoza's truck. Mr. Espinoza had parked a reasonable distance away, out of traffic, and was causing no issue for the Defendants. Mr. Espinoza's truck was legally parked, off the roadway, and in no way impeding or interfering with traffic or the traffic stop of Mr. Espinoza's son:



28. When Defendant Noel arrived at Mr. Espinoza's truck, he heard Defendant Trujillo telling Mr. Espinoza to leave. Noel repeated this command, and Mr. Espinoza began to pull away from the scene in compliance with the command. Defendant Noel then fabricated a scenario in which he was dragged by Mr. Espinoza's vehicle by stating in the APC that "At this point my left hand, I attempted to open Kenneth's driver-side door, which then got lodged in the door handle as he accelerated forward with his vehicle. Kenneth's vehicle traveled an unknown amount of feet while my left hand was still lodged in his vehicles outside door handle before he came to a stop." Noel took the lie a step further, memorializing an even more exaggerated version of his fabrication that he was drug by Mr. Espinoza's truck in the

referred charges document he authored:

> CRS 18-3-203(1)(c) 2nd Deg Assault On Police Officer, a Class 4 felony TO WIT: while in contact with Kenneth, Dep Noel had his hand in the door handle of Kenneth's truck, Kenneth placed the truck in motion, causing Dep Noel's hand to become stuck in the door handle, Dep Noel was dragged forward and backward by Kenneth's truck, causing pain

29. However, Defendant Noel's body camera clearly shows him grabbing for the handle of the truck *after* it is moving. It also shows his hand slip off the handle *immediately*. Noel's body camera footage could not more clearly show that his hand was never stuck in the door handle, and that he was never drug by Mr. Espinoza's car. Despite this, Noel asserted in his report that "Kenneth's vehicle could be heard accelerating as I stood beside it as he drove forward at or about 10mph…." However, body camera from both Noel and Trujillo shows that Mr. Espinoza's truck did not move forward even a single car length before he stopped. Noel's assertion that his hand was stuck in Mr. Espinoza's truck door, and that he was drug by the truck is patently false and a complete fabrication in an attempt to justify his use illegal use of force.

30. Further, Noels' body camera shows Defendant Noel *repeatedly* grabbing the door handle and attempting to operate the mechanism with each hand, before grabbing his pistol and pointing it at Mr. Espinoza. Defendant Noel further states that he "experienced a striking thumping and tremendous pain in my left hand and swelling" and suggested that he received medical treatment for his "injury". Defendant Noel neglected to mention that he was discharged with, at best, a general 'musculoskeletal' injury, and was not prescribed anything by the attending physician to deal with this alleged 'injury'. The source of Noel's hand pain, if any, can

easily be attributed to him violently slamming the butt of his pistol onto the hood of Mr.

Espinoza's truck as he ran around the passenger side to begin tasing Mr. Espinoza:



31. Mr. Espinoza's truck was further damaged when the officers slammed his body into the rear

driver side door, causing it to bow completely inwards.

32. Defendant Noel further diminished his own egregious behavior when he describes in the

APC how Mr. Espinoza failed to comply with orders to get out of his truck. Defendant Noel

wrote several paragraphs describing this part of the encounter, where he entered the

passenger side of Mr. Espinoza's truck and forced Mr. Espinoza out while Defendant Trujillo

was pulling him from through the driver side widow.  Defendant Noel fails to mention that

he employed even one Drive Stun to Mr. Espinoza's backside. Noel drive stun tasered Mr.

Espinoza approximately 15 times while he was seated in his truck. The description of Mr.

Espinoza's alleged 'resistance' is clearly and utterly contradicted by body camera of both

Defendants.

33. Similarly, later in the APC, Defendant Noel described alleged 'resistance' by Mr. Espinoza, and that he took a "fighting stance" as he was being shoved into the police vehicle, with his hands cuffed behind his back. This is a blatant fabrication.  As discussed above and seen on body camera, Defendant Noel tries to justify Defendant Trujillo's eventual Taser deployment into Mr. Espinoza's face by claiming that Mr. Espinoza was kicking at officers, but wholly ignores that fact that he was continuously drive stunning Mr. Espinoza to try to force him into the vehicle. Body camera footage shows the repeated, approximately seven (7) additional drive stun tases, in addition to Trujillo's taser deployment to Mr. Espinoza's face, but does not show Mr. Espinoza at any point attempting to kick or strike either Defendant, because he simply did not do so.

34. Finally, Noel wrote in his APC as the factual basis for him charging Mr. Espinoza with Attempted 2nd Degree Assault of a Peace Officer:

> CRS 18-2-101; 18-3-203(1)(c) Criminal Attempt to commit 2nd degree assault on a police officer, a class 5 felony TO WIT: Kenneth Placed his truck in reverse and nearly striking Lt Trujillo and his patrol car.
>
> 8

35. However, Noel's fabrication that Mr. Espinoza nearly hit Trujillo is unequivocally contradicted by his own body camera, which here shows that as Mr. Espinoza reversed, Trujillo was standing on the complete opposite side of his patrol car, (Trujillo's legs indicated by the arrow):



*Trujillo falsified statements:*

36. Defendant Trujillo also wrote a false and/or minimized statement as to what occurred during this encounter with Mr. Espinoza. He first claimed that as Mr. Espinoza began to drive away, he almost struck Defendant Noel, first while moving forward, and again while reversing out of the middle of the road. However, body camera footage clearly contradicts this accusation.

37. Defendant Trujillo further claims that at multiple points during this interaction Mr. Espinoza allegedly kicked at the Defendants. Trujillo makes this claim in order to justify his deployment of his taser into Mr. Espinoza's face. However, as seen on body camera and described in detail above, Mr. Espinoza was actually just being shoved by Trujillo and drive stun tased by Noel into the police vehicle before he turned to face Trujillo, and was tased by him. Trujillo also claims that Mr. Espinoza kicked the door of the police car open at him, but body camera footage clearly shows Defendant slamming the door shut on Mr. Espinoza's leg, rather than making sure that Mr. Espinoza was properly seated within the vehicle.

38. Next, Defendant Trujillo claimed in his report that Mr. Espinoza "slipped on the snow/ice and fell" once he was removed from the police vehicle as described. However, body camera

(and photos above) clearly show that Trujillo ripped Mr. Espinoza out of the car directly onto the back of his head on the snow/ice covered pavement.

39. Finally, Trujillo wrote in his report that "while at the hospital, Espinoza admitted that his actions were wrong.  Espinoza advised that he was travelling in front of his son, but when his son was pulled over, he turned his vehicle around and parked behind deputy Noel.  Espinoza admitted that he should not have done that and that he didn't want any hard feelings."  This conversation simply did not happen and cannot be verified as Trujillo turned off his body camera, in violation of LACSD policy and state law, as soon as he entered the hospital with Mr. Espinoza.

## HENRY TRUJILLO: NEVER ELIGIBLE TO BE A POST CERTIFIED PEACE OFFICER

40. Henry Trujillo has not been eligible to be a P.O.S.T. certified peace officer in Colorado since 1998.  On September 16th, 1998 Trujillo was convicted, at trial, of Harassment, in violation of C.R.S. § 18-9-111(c).  Trujillo was charged with this crime just *eight days* after finishing his probation from 97CR158. This conviction, pursuant to C.R.S. § 24-31-305(1.5)(V)(previously subsection 'e'), would require the P.O.S.T. board to deny his application to become a P.O.S.T. certified peace officer.  Trujillo first applied to LACSD in September of 2001. On his 2001 application, as well as his three subsequent applications to LACSD, Trujillo omitted this conviction.  Likewise, LACSD failed to properly conduct a background check on Trujillo, or this readily available court record of conviction would have immediately disqualified him to be hired as a deputy sheriff.

## HENRY TRUJILLO: A HISTORY OF VIOLENCE

41. Defendant Trujillo has a long history of violence.  In fact, Trujillo has been charged with and

convicted of multiple crimes involving violence and weapons spanning three decades:

    a.  In Las Animas County case 97CR58, Trujillo was charged with Felony Menacing with a Weapon and eventually pled guilty to Disorderly Conduct: Displaying a weapon;

    b.  In Las Animas County case 98CR176, Trujillo was charged with and convicted of Misdemeanor Harassment, after a court trial.

    c.  In Las Animas County case 06M261, Trujillo was charged with Disorderly Conduct: Fighting in Public, and Menacing.  Trujillo pled guilty to Disorderly Conduct: Fighting in Public.

    d.  In Las Animas County case 09M188, Trujillo was charged with Harassment: Obscene Language/Gesture, Disorderly Conduct: Offensive Gesture; and Disorderly Conduct: Unreasonable Noise, to which he pled guilty.

42. Additionally, Trujillo has been subject to restraining orders in five (5) separate cases, two of

which alleged domestic abuse, in Las Animas County Cases 03C331; 06C31; 06C244;

06C274; 07C451; and 20C44.  Despite his long history of involvement with domestic abuse

and criminal violence, Trujillo maintained his employment as a Peace Officer.

43. Shockingly, in Las Animas County Domestic Abuse case 06C244, Trujillo was subject to a

protection order that was governed by the Brady Handgun Violence Prevention Act, from

June 6th, 2006 until November 30th, 2006.  During this nearly six (6) month period of time,

Trujillo was still employed as a peace officer with the LACSD, despite being prohibited by

Federal Law 18 U.S.C. § 922 (g)(8) from possessing any firearms.  The Court in 06C244

found that Trujillo "constitutes a credible threat" and that he posed "an imminent danger" to

the "life and health of the protected party":



44. On April 19th, 2006 in an inexplicably uncharged incident, officers from the City of Trinidad

Police Department responded to Trujillo's house on a report that he was intoxicated, suicidal

and in possession of multiple firearms.  The responding officers confiscated Trujillo's

multiple firearms, including an AR-15 assault rifle, out of concern his and others' safety. Despite this incredibly alarming incident which was reported to Navarette, LACSD did not discipline, investigate or take any action regarding Trujillo.

45. In Las Animas County case 14CR68, Trujillo assaulted his own paraplegic brother, Richard, following a petty argument over baseball cards.  In that case, Trujillo chased his brother through town, eventually pulling him out of his handicap equipped car and dragging him across the highway, severely damaging his skin and leaving him without his wheel chair, which required him to humiliatingly crawl on his stomach and hands across the road and back to his vehicle.  Trujillo attempted to charge his brother Richard with eluding, however the District Attorney dismissed the case after viewing the injuries Richard received at the hands of his own brother.

46. In 2017, Trujillo shot and killed an unarmed man while on duty.  According to LACSD's response to a 2023 CORA/CCJRA request, no internal investigation was conducted in connection with this incident, nor was any complaint recorded.  The victim's family directly dispute this and assert that they made a complaint and pushed for the termination of Trujillo.

## PREVIOUS EXCESSIVE FORCE LAWSUIT AGAINST BOTH DEFENDANTS TRUJILLO AND NOEL

47. On November 17th, 2022 Las Animas County settled a case involving the deprivation of rights of a deaf woman and her deaf partner in case *22-cv-01499-CMA-MDB* filed in the United States District Court for the District of Colorado. Defendants Noel and Trujillo were

the two acting deputies in that incident and as such were both named defendants. *22-cv-01499-CMA-MDB* involved the use of excessive force, violations of the Americans with Disabilities Act, and a failure of LACSD to train and supervise its employees. Just *12 days* later, the exact same Defendants engaged in the same unlawful behavior that led to this case.

48. In response to an open records request made pursuant to CORA and the Colorado Criminal Justice Records Act (CCJRA), no investigation was conducted in connection with that case, despite a substantial settlement being reached, nor do either Defendant's employee files contain a single complaint in connection therewith.  Additionally, the Board's response to a 2023 CORA/CCJRA request claims no knowledge of this documented settlement payment, made in part or in whole with taxpayer funds, and is the type payment that likely required Board approval.

## POLICY VIOLATIONS: TRUJILLO AND NOEL

49. "Traffic contacts can be a very constructive way of improving the Offices public image and public confidence. The attitude of the deputy during the contact should be respectful and positive." Las Animas County Sheriff's Office, policy 1401.  Both Noel and Trujillo displayed horrible, aggressive attitudes from the very beginning of their encounter with Mr. Espinoza, despite his total compliance with their commands and having no legal authority to contact him.

50. LACSD policy 1302 guides LACSD employees on the use of force.  Notably, 1302(II)(A) instructs deputies that they must adhere to the statutory provisions of C.R.S. §18-1-707(1).

Both Trujillo and Noel completely disregarded this policy and the provisions of C.R.S. §18-1-707(1) here. C.R.S. §18-1-707(1) states that "A peace officer may use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the peace officer or another person." None of the permissible circumstances for the use of physical force existed here. Mr. Espinoza was simply an innocent bystander, waiting for his son's traffic stop to be completed so they could continue on their way to the Ford dealership. Despite this, and his compliance with Trujillo and Noel's commands to leave, both defendants immediately resorted to the threatened use of *deadly force*, by pointing their guns directly at his face. Defendants both then proceeded to repeatedly use violent physical force against Mr. Espinoza, without any justification, as he had committed no criminal offenses and was wholly compliant with their commands.

51. Further, LACSD policy 1302(III)(D)(2)(e) states that "Officers will not display or brandish any weapon without intent and justification to use that weapon." Again, both Trujillo and Noel completely disregarded this policy. When Mr. Espinoza was repeatedly told to leave the scene, and in fact began to drive away in compliance with that command, absolutely no justification whatsoever existed for the use of deadly force against him, yet both Trujillo and Noel inexplicably drew and pointed their pistols directly at Mr. Espinoza's face. This pattern failure to follow their own Use of Force Reporting policy is displayed by their involvement as defendants in *22-cv-01499-CMA-MDB,* which asserted they both used excessive force.

52. LACSD Taser policy is governed by an un-number policy titled "Less-Lethal Electrical Control Devices" which was implemented in 2009 and last revised in 2011. Part E of this

policy prohibits deputies from using their taser against a subject who is "in a restraint device and is only offering verbal noncompliance or passive resistance…". Here, Mr. Espinoza was compliant with all commands being given by both Trujillo and Noel but despite this, was tased by both of them, including one time simultaneously, while handcuffed behind his back. While this policy does provide exceptions permitting a restrained person to be tased, it does define them as "rare situations" and in those instances, "the authorizing supervisor must be able to list and describe the specific factors that led him or her to conclude that the use of the [taser] on the individual was a safer alternative to other available and practical options." Noel and Trujillo failed to identify said factors, in accordance with policy.

53. LACSD Taser policy further prohibits a deputy from using a taser against a person, without exception, in additional circumstances relevant here:

    a. "the person is fleeing and the deputy does not have sufficient information to believe that the person is a danger to themselves or others;"

    b. "the subject is in a moving vehicle;"

54. Here, when Mr. Espinoza moved his truck forward in compliance with Noel and Trujillos' commands to leave the scene, Trujillo and Noel had absolutely no reason to believe that he was a danger to anyone, yet tased him multiple times.  In fact, Noel tased Mr. Espinoza approximately 15 times *while he was seated in the driver's seat* of his truck, unable to put the vehicle in park because of the physical force being used against him by both officers.

55. Likewise, LACSD policy 1302(V)(A) mandates that "In all incidents, where a Office employee uses force on a subject that involve more than the standard hand contact and speed handcuffing, will have a have a Use of Force Report filed by the officer using force."  Both

Trujillo and Noel used force that implicates this mandatory reporting, however no Use of Force Reports were completed by either officer.  Sheriff Navarette is tasked with reviewing all Use of Force Reports, to "indicate whether the Department views the officer's actions as justified or not justified."  Sheriff Navarette failed to do so here, as no Use of Force Report was completed by either officer.

56. Trujillo and Noel also failed to follow LACSD policy 1403 "Tow of vehicle/police impound".  LACSD policy 1403(E) gives specific circumstances when a vehicle can be towed following the arrest of the operator:

    a.  "If the vehicle is not already parked legally at the time of custody, the driver shall not be permitted to park the vehicle. The deputy may legally park the vehicle at the request of the arrested person only after a Release of Liability Form has been signed by the arrested person.

    b.  If the vehicle is not legally parked and is a hazard at the time of custody, and the arrested person does not give permission for the vehicle to be moved by the deputy it shall be towed.

    c. If the arrested person gives permission for the vehicle to be given to the care of another person at the scene, the vehicle shall not be released by the deputy until after the arrested person has signed a Release of Liability Form."

57. None of the above procedures were followed in this incident.  Mr. Espinoza's truck was legally parked along Main Street and there was no reason to tow it.  Additionally, Noel failed to fill out the Tow Sheet, as required by policy.  This unauthorized tow resulted in significant, unnecessary expense to Mr. Espinoza.

58. Finally, Trujillo failed to follow LACSD policy and state law regarding the use of body camera.  As stated above, Trujillo turned off his body camera while transporting Mr. Espinoza to the hospital, and again while in the hospital.  Under C.R.S. § 24-31-902, a peace

officer is not permitted to turn their body camera off during the transport of a civilian.
C.R.S. § 24-31-902(1)(a)(III) creates a "permissive inference… that the missing footage
would have reflected misconduct by the peace officer." This inference is certainly applicable
here, as Trujillo turned off his body camera during the entire transport of Mr. Espinoza to the
hospital, and the entire time he was at the hospital. LACSD policy 1212 requires that
Deputies: "record all Law Enforcement contacts with the public with the following
exceptions:

 1. VIN verifications

 2. Fingerprints

 3. Medical exams – camera must be turned off when medical information is being
 discussed to prevent a HIPPA violation. If a disturbance takes place while at the ER
 active camera. As soon as it is under control deactivate camera.

 4. Interviews conducted in the Sheriff's Office interview room if the DVD recorder.

59. None of the above exceptions apply to Trujillo's transport of Mr. Espinoza to the hospital
and jail.

**VIOLATIONS OF POLICY AND LAW: LACSD, NAVARETTE AND SANTISTEVAN**

60. Defendants failed to follow LACSD policy 1302(V)(C)(2) which requires the Sheriff to
conduct an investigation of the incident in "all incidents where an accusation of excessive
force is made." Here, Mr. Espinoza's son did exactly that on the day following this incident,
and Undersheriff Santistevan even responded to the complaint by stating "I know why you
are here" however, still no Use of Force Report was completed.

61. Likewise, Defendants failed to follow LACSD policy 1106- Internal investigations. Policy 1106 states that "Upon receipt of a complaint, the Undersheriff shall complete the appropriate portion of the Internal Investigation Action Report and assign and investigator of his or her choice." This never happened in response to Mr. Espinoza's son Nathan's complaint, and apparently never happened in response to *22-cv-01499-CMA-MDB.*

62. Similarly, LACSD Taser policy part H requires, in *every* taser deployment, that a Use of Force Form has been completed and sent "to the Sheriff/Undersheriff and Taser Instructor, prior to entry into the Use of Force database." Sheriff Navarette and Undersheriff Santistevan failed to do this here.

63. In fact, Defendants failing to even record the Use of Force here constitutes a failure to comply with C.R.S. §24-31-903(2)(a), which requires every "local law enforcement agency" to report to the division of criminal justice following "All use of force by its peace officers that results in death or serious bodily injury or that involves the use of a weapon," and also requires such disclosure, under subsection (VI) "…a peace officer unholstered or brandished a weapon during the incident, and if so, what type of weapon." Here, Noel and Trujillo each pointed their pistols at Mr. Espinoza, in addition to both tasing him, yet no Use of Force form was completed.

64. Navarette and Santistevan failed to follow the body camera review provision of LACSD policy 1212(III)(g), which requires, "In the case of a major incident where camera was activated, camera footage is not to be reviewed by any Deputy. The Deputy involved will give their body camera to their supervisor who then will give it to Sheriff, Undersheriff, and

Investigator/CBI Agent." Navarette and Santistevan apparently failed to conduct any review of this incident whatsoever.  Their failure to do so here as well as in the numerous prior cases that involved one or more of the defendant officers, clearly implicates a policy, custom and practice of covering up, concealing and failing to memorialize officer misconduct. This practice is a clear failure of LACSD to supervise its officers in accordance with state law and in a way likely to impact the constitutional rights of citizens they encounter.

65. Similarly, LACSD failed to follow the mandatory officer credibility reporting provisions of §16-2.5-502.  LACSD's failure to follow the provision of this law, and their own credibility policy (LACSD policy 1106A) is yet another example of their failure to train, supervise, and discipline their officers in a manner that is likely to violate the constitutional rights of citizens they encounter, just like Mr. Espinoza.  While both Trujillo and Noel made many, many fabrications about what happened, the requirements of C.R.S. §16-2.5-502 are aimed squarely at instances like this case, where both Trujillo and Noel blatantly lied about Noel getting his arm stuck in Mr. Espinoza's truck door and being drug backwards and forwards. This blatant lie, told by *both* officers, was unquestionably a nefarious attempt to justify their wildly excessive use of force against Mr. Espinoza.

66. The repercussion of LACSD's failure to follow its own policies and the mandatory misconduct provisions of Colorado Law, is clear upon viewing the Colorado Department of Law: Peace Officer Standards and Training website database,[1] which as of the filing of this complaint, indicates that not a single required P.O.S.T. report has been made by LACSD,

---

[1] https://post.coag.gov/s/

despite numerous qualifying actions in this case alone.  LACSD's failure to comply with these state reporting laws confirms a wide reaching custom and practice disregarding the rule of law, the Constitutional rights of citizens they encounter, and resulting in clear and repeated damage to the people of Las Animas County.

67. Similarly, defendants Navarette and Santistevan failed to follow their own policy and procedure in conducting applicant background checks with respect to the repeated re-hiring of Trujillo. LACSD policy 1107 requires a background check be conducted on all applicants:

> "The Undersheriff shall assign an investigator of his or her choice to conduct the investigation.  The investigator shall complete as thorough an investigation as possible into an applicant's personal history, employment history, drug abuse history, education history, and the complete a written report to the Undersheriff of their findings.  The report shall include a print out of all material on the applicant form the CCIC/NCIC system."

68.  However, Santistevan and Navarette repeatedly either failed to conduct or ignored the results of any background check when hiring and rehiring Trujillo. Trujillo has been employed by the Las Animas County Sheriff's Department on *four separate* occasions:

a. From September 2001 until February 2002.  Trujillo apparently left to work as a police officer for the City of Trinidad Colorado, from which he was forced to resign following a string of misconduct incidents in 2005;

b. From September 2005 until June 2009 in which he was forced to resign because of "criminal charges" he pled guilty to and were subsequently "deferred";

c. From May 2010 until January 2016 in which he resigned for unknown reasons;

     d.  From September 2017 until the present, and is now 3rd in command at LACSD.

69. LACSD's own background policy exists for obvious reasons: to not only determine if an applicant is a proper fit for the duties of a peace officer, but also to ensure that its officers are *legally eligible* to be peace officers. Despite having access to publicly available court documents and the NCIC, LACSD failed to investigate or apparently ignored that not only did Trujillo have a conviction for an weapons assault type charge in 97CR58, but that he also was convicted of harassment in 98M176, which is a P.O.S.T. disqualifying conviction that Trujillo *never disclosed* on any of the *five* applications he submitted to LACSD.

70. Likewise, LACSD either failed to conduct or ignored the results thereof from his termination as a police officer for the City of Trinidad.  Conducting this required background check, each of the four times Trujillo was hired by LACSD, would have revealed, as discussed thoroughly herein, numerous disqualifications for his employment as a peace officer.  The required background check would have also shown that Trujillo was specifically named in a 2006 civil lawsuit, 2006-cv-00953 *Kurzenberger v. City of Trinidad*, in which the complaint documented Trujillo's repeated misconduct and subsequent suspensions. During his employment as a police officer for the City of Trinidad, Trujillo engaged in repeated misconduct, including one year in which he was suspended three times.  Trujillo was suspended for DUI, though the department failed to file charges against him.  Trujillo was again suspended after crashing his patrol vehicle while under suspicion of DUI, however, contrary to policy, his blood alcohol level was never tested. Trujillo received a five day suspension for an unknown reason in 2004.   Trujillo was again suspended for an uncharged

domestic violence incident which resulted in him being required to undergo domestic violence therapy and alcohol treatment. LACSD either failed to do a background check into his employment records from the City of Trinidad, or wholly ignored them when he was rehired by LACSD in 2005, and again in 2010 and 2016.

71. Finally, the required background check would have revealed that Trujillo was never eligible to be a P.O.S.T. certified peace officer in Colorado because of his conviction in 98M176 for harassment, in violation of C.R.S. §18-9-111(c).

## LAS ANIMAS SHERIFF'S FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE DEFENDANTS TRUJILLO AND NOEL

72. Despite an established history of misconduct within the very department he now works, Henry Trujillo has *never* been disciplined for *any* misconduct by the Las Animas County Sheriff's Department. In response to Mr. Espinoza's February 2nd, 2023 CORA and CCJRA requests for copies of any Internal Investigations, complaints or remedial trainings required to taken, Undersheriff Rey Santistevan replied that no such documents existed regarding Trujillo. It is shocking that a department who has fired a Deputy for misconduct, *criminal in nature*, and settled an excessive force claim against him as recent as 2022, has absolutely no documentation related to the established misconduct, nor required him to undergo any remedial training. This is particularly alarming, given that Trujillo was a defendant in *22-cv-01499,* which asserted claims against Trujillo for using excessive force against two disabled individuals that were not suspected of any criminal wrong doing, and shocking that despite

shooting and killing a citizen on duty in 2017 *no internal investigation whatsoever* was done in connection therewith.

73. Similarly, Undersheriff Rey Santistevan responded the same in regards to an identical CORA and CCJRA request for the same documents related to Deputy Mikhail Noel.  The apparent non-existence of any such documents in either Noel's or Trujillo's file, despite established incidents of misconduct makes apparent a Department custom and/or policy of failing to discipline, train and supervise its officers, even when they engage in harmful misconduct resulting in injury to the citizens with whom they interact.  When the same two officers repeatedly engage in excessive force against citizens, especially those not suspected of committing *any crime*, it is apparent that this is a situation in which said officers are likely to violate the constitutional rights of these citizens and is an area of obvious need for training.

74. Additionally, the absence of said documents makes apparent that LACSD has a practice of ignoring its own policies to cover up its officers' misconduct.  This is further evidenced by Mr. Espinoza's son's actions the day following this incident.  Mr. Espinoza's son Nathan went to the LACSD office the day following this incident to lodge a complaint against both Trujillo and Noel.  Undersheriff Santistevan responded to Nathan's complaint by stating "I know why you are here," then proceeded to discourage Nathan from making any statements, because they "would be used against [his father] in the criminal case."  Not surprisingly, no complaint from Nathan or Mr. Espinoza was memorialized and included in either Trujillo or Noels' employee file, nor was any investigation into the use of force conducted.

75. Alarmingly, LACSD appears to have actually rewarded Trujillo for his unlawful actions in January of 2022, when they increased his salary by 43% over the previous year, doing so just 18 months after his actions that resulted in *22-cv-01499*.

76. Likewise, LACSD failed to hold Trujillo accountable for numerous lies on his employment applications- Trujillo never disclosed his 98M176 conviction; Trujillo frequently indicated that he had never been terminated or asked to resign, despite being forced to resign by the City of Trinidad Police Department and LACSD itself; Trujillo frequently failed to give any details of prior employment suspensions, terminations and resignations, despite the LACSD application expressly requiring applicants to do so; Trujillo repeatedly answered "no" in the section that required disclosure of any instances of DUIs or traffic accidents, despite being suspended by Trinidad Police multiple times for just such instances; and finally Trujillo failed to ever disclose that he was subject to a protection order that prohibited him from possessing a firearm, in violation of Federal Law.

77. Finally, on April 24th, 2023 Sheriff Navarette issued a press release in response to the body camera footage released by Mr. Espinoza.  In that statement, Sheriff Navarette stated that Mr. Espinoza was tased only one time by Trujillo and that Noel never actually used his taser against Mr. Espinoza.  Navarette further stated that the department actually had data from Noel's taser itself to back up his false claim that Noel never discharged his taser.  This statement is particularly shocking because you can clearly see on body camera Noel discharging his taser over and over against Mr. Espinoza's body, made evident not only by the physical motion of Noel's hand while grasping the taser, but you can see the arc at the

end of the taser, hear the popping noise made by the taser discharge, see Mr. Espinoza physically reacting to being tased, and that Mr. Espinoza has burn marks in several places on his body from Noel's taser.  Perhaps even more alarming is Navarette's assertion that the department has data to backup this lie.  Tasers have a downloadable memory that very accurately and securely records each time a taser was deployed, how long the deployment was, and is tied to the particular deputy.  Navaratte's April 24th, 2023 press release is thus not only a blatant lie, easily invalidated by the body camera, but also a clear indication of LACSD's policy and practice of covering up its officers' misconduct by any means necessary, to include lies and a willingness to tamper with physical evidence.

## LAS ANIMAS SHERIFF HAS A POLICY OF ENCOURAGING VIOLENCE

78. LACSD has a policy of encouraging the use of violence and excessive force by its deputies. This policy is made evident by its repeatedly hiring and non-discipline of Trujillo, despite a nearly three decade history of documented violence.  Similarly, LACSD apparently has pushed this policy of encouraging violence on its newer members, such as Noel, which is made evident by their complete failure to investigate or train him as a result of a significant settlement paid on his behalf in a case involving excessive force.

79. On April 13th, 2023 at a job fair at Trinidad State Junior College, LACSD setup a both to recruit potential deputies.  The table, shown below and again posted to the LACSD public Facebook page, is covered entirely with weapons. Other photos on the page actually show officers showing students how to use them.  These photos make clear that LACSD's culture

of violence and encouragement of the use of weapons is not just a policy it encourages with

its existing deputies, but is actively promoted as a recruitment tool:



80. LACSD's policy of encouraging violence was further memorialized in the below post to their

public Facebook page:



81. The above photo (Defendant Trujillo, top row, center) shows the entirety of the LACSD pointing pistols at the camera with a shocking caption, memorializing an ideal that LACSD is engaged in warfare and the focus of their training is the use of weapons.  Any characterization of the above photo as a joke or misrepresentation of the policy and focus of LACSD is quickly dispelled in an examination of the LACSD's budget.  From 2010 to 2022, LACSD spent $49,168 on ammunition for training, while just $32,842 on personnel training.  This means that on average LACSD spends 1.5 times as much on ammunition as personnel training.  This time frame includes a high of $6,741 spent on ammunition in 2017, while spending just $72 on personnel training in 2015.  The average amount spent on ammunition by LACSD provides each deputy approximately *1,720 bullets per year*, assuming a conservative $.20/per 9mm bullet and an average of eleven deputies.

## <u>CONCLUSION</u>

82. LACSD has a history and documented pattern of covering up its employees' and own department's repeated unlawful actions.  This is made evident not only by the outrageousness of Trujillo and Noel's actions against Mr. Espinoza, but in the nearly 25 year period in which Trujillo was employed at LACSD in which LACSD and the Board either ignored, unlawfully failed to document, or even rewarded his unlawful conduct.  The Board, being tasked with oversight and promulgation of appropriate policy in regards to Las Animas County employees, has similarly repeatedly ignored or failed to follow its own policies which govern the conduct of Sheriff's Department employees such as Defendants Navarette, Santistevan, Trujillo and Noel here.  As a result of Trujillo and Noels' unlawful actions, and LACSD's

and the Board's pattern and practice of concealing and rewarding the unlawful behavior of its employees, Mr. Espinoza as a direct and proximate cause thereof, suffered real harm in the form of physical pain and suffering, medical expense, property damage, unnecessary legal expenses, mental and physical pain and suffering, and emotional distress.

## FIRST CLAIM FOR RELIEF

### Civil Action for Deprivation of Rights, Pursuant to C.R.S. §13-21-131

### Article II Section 7 of the Colorado Constitution– Excessive Force

(against Defendants Trujillo, Noel)

83. Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

84. Within *three (3) seconds* of both Trujillo and Noel ordering, without justification or authority, for Mr. Espinoza to leave the scene, both threatened the use of deadly force by pointing their pistols at him, when the only action Mr. Espinoza had taken at that point was to comply with their orders to leave, and began driving away.  The threaten use of deadly force, was completely unreasonable, completely unjustified and completely outrageous.  The Defendants' threatened use of deadly force here was against LACSD policy, against state law, and violated Mr. Espinoza's constitutional rights.

85. Then, when Defendant Trujillo suddenly, violently and without justification physically attacked Mr. Espinoza by wrenching his arm outside of the driver window, and then later deployed a taser into Mr. Espinoza's face, before finally slamming Mr. Espinoza down on icy pavement on the back of his head, as set forth above, he assaulted Mr. Espinoza,

employing excessive and unlawful force, in violation of Article II Section 7 of the Colorado Constitution.

86. When Defendant Noel suddenly, violently and without justification physically attacked Mr. Espinoza by repeatedly drive stunning Mr. Espinoza approximately fifenn (15) times, and then doing so again later while Mr. Espinoza was in handcuffs, totally approximately thirty five (35) taser stuns, he assaulted Mr. Espinoza, employing excessive and unlawful force, in violation of Article II Section 7 of the Colorado Constitution.

87. No officer (other than those unquestioning officers involved here) would consider Defendants' deployment of painful force and excessive aggression upon Mr. Espinoza to have been reasonable or justified under the circumstances.  Additionally, Defendants' action were in blatant disregard for their own agency's policies.

88. Defendants' physical assault on Mr. Espinoza was unnecessary and unreasonable. When Trujillo approached Mr. Espinoza, he was sitting in his truck, parked off of the side of the road, approximately 75 feet behind a traffic stop that was being conducted by Noel on Mr. Espinoza's son. Mr. Espinoza was not crowding Noel, and didn't "roll up" on him either. Trujillo ordered Mr. Espinoza to leave for no legal reason, stating only that "we [police] don't like people stopping behind our traffic stops". Trujillo then decided to escalate the situation when Mr. Espinoza initially would not leave the area. Mr. Espinoza was not violating any law by doing what he was doing. However, Defendants' escalated this encounter by fabricating justification to contact Mr. Espinoza, and then assaulting him violently as described in detail above. Each Defendant had both the opportunity and duty to intervene and stop the ongoing violence towards Mr. Espinoza, but chose instead to

contribute to the assault and attempt to cover up the misconduct by making false statements leading to the arrest and criminal charging of Mr. Espinoza.

89. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which includes seizures carried out with excessive force, like this one. Defendants effected this assault and injuries to Mr. Espinoza with deliberate indifference to his rights.

90. Defendants' unjustified and violent seizure and assault upon Mr. Espinoza caused him to experience great physical pain, injury, terror and exposed him to great risk of death.  This experience continues to cause Mr. Espinoza trauma and emotional distress, along with lasting physical injuries.

91. Plaintiff further seeks injunctive relief against Defendants Trujillo and Noel, prohibiting them from maintaining P.O.S.T. certification. C.R.S. § 13-21-131(1) authorizes this court, upon a finding of Defendants' liability, to order "legal or equitable or any other appropriate relief."  Plaintiff believes this injunctive relief, in the form of revoking Defendants' P.O.S.T. certification, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

**SECOND CLAIM FOR RELIEF**

**Civil Action for Deprivation of Rights-Unauthorized Use of Force, as Defined in C.R.S. § 18-1-707**

**Article II Section 7 of the Colorado Constitution- Unauthorized Use of Force**

(against Defendants Trujillo, Noel)

92. Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

93. Plaintiff brings this count against Defendants for the unlawful use of physical force.  C.R.S. § 18-1-707(1) permits an officer to use of physical force only "if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the peace officer or another person." In this incident, Defendants' use of force was not justified in anyway.  Mr. Espinoza was not in violation of any law that would justify law enforcement contact. Mr. Espinoza was simply an innocent bystander, yet within three (3) seconds after unlawfully ordering him to leave the scene, Trujillo and Noel threatened him with deadly force by pointing their pistols at his face.  In those three seconds between being told to leave and being threatened with deadly force, the only actions Mr. Espinoza took was to attempt to drive away, the exact action he was ordered to take by Defendants Noel and Trujillo.   Any justification for their actions justification was fabricated by Defendants, who then used this false justification to violently assault Mr. Espinoza as described in detail. complying with officer commands.  Defendants were each complicit in the other's actions and themselves participated in the assault on Mr. Espinoza.

94. Defendant's unauthorized use of physical force constituted a further deprivation of Mr. Espinoza's constitutional rights guaranteed in Article II sections 3, 7, 18, and 25 of the Colorado Constitution.

95. Plaintiff was damaged and injured by this unauthorized use of physical force.  This conduct resulted in the unconstitutional search and seizure of Plaintiff, and directly and proximately

resulted in his lengthy incarceration, bond supervision costs, travel expenses, and caused him physical and emotional pain and suffering.

96. Plaintiff further seeks injunctive relief against Defendants Trujillo and Noel, prohibiting them from maintaining P.O.S.T. certification. C.R.S. § 13-21-131(1) authorizes this court, upon a finding of Defendants' liability, to order "legal or equitable or any other appropriate relief." Plaintiff believes this injunctive relief, in the form of revoking Defendants' P.O.S.T. certification, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

## THIRD CLAIM FOR RELIEF

### Civil Action for Breach of Duty to Intervene, in Violation of C.R.S. § 18-8-802 and C.R.S. §13-21-131

(against Defendants Trujillo, Noel)

97. Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

98. Plaintiff further brings a Breach of Duty to Intervene action against Defendants Trujillo and Noel, pursuant to C.R.S. § 18-8-802 and C.R.S. § 13-21-121. As alleged herein, Trujillo not only failed to intervene in Defendant Noel's use of excessive force, but in fact committed his own assault on Mr. Espinoza, and vice versa. Said actions thus constitute a further and additional violation of Mr. Espinoza's constitutional rights in Article II sections 3, 7, 18, and 25 of the Colorado Constitution.

99. Plaintiff was damaged and injured by Defendants' intentional failure to intervene and stop the ongoing assault on Mr. Espinoza. As Noel's direct supervisor, Defendant Trujillo, a Lieutenant, had the actual authority and duty to order Noel to stop his assault of Mr.

Espinoza. However he did not do so, but chose instead to contribute to the assault. Defendants' directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.

100.    Plaintiff further seeks injunctive relief against Defendants Trujillo and Noel, prohibiting them from maintaining P.O.S.T. certification. C.R.S. § 13-21-131(1) authorizes this court, upon a finding of Defendants' liability, to order "legal or equitable or any other appropriate relief."  Plaintiff believes this injunctive relief, in the form of revoking Defendants' P.O.S.T. certification, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

**FOURTH CLAIM FOR RELIEF**

**Civil Action for Deprivation of Rights, Pursuant to C.R.S. § 13-21-131**

**Article II Section 25 of the Colorado Constitution- Violation of Substantive Due Process**

(Defendant Trujillo)

101.    Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

102.    LACSD policy 1212 requires that Deputies: "record all Law Enforcement contacts with the public with the following exceptions:

1. VIN verifications

2. Fingerprints

3. Medical exams – camera must be turned off when medical information is being discussed to prevent a HIPPA violation. If a disturbance takes place while at the ER active camera. As soon as it is under control deactivate camera.

4. Interviews conducted in the Sheriff's Office interview room if the DVD recorder.

103.    None of the above exceptions apply to Trujillo's transport of Mr. Espinoza to the hospital and jail.  State law, C.R.S. § 24-31-902(II)(A) similarly requires officers to activate their body camera "during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law."  None of the exception provision of C.R.S. § 24-31-902 apply to the transport of arrestees to the hospital.  Thus, Trujillo's failure here to activate his body camera during his transport of Mr. Espinoza to the hospital creates a statutory presumption "that the missing footage would have reflected misconduct by the peace officer." C.R.S. § 24-31-902 (III).  This missing footage in fact does reflect misconduct on Trujillo's behalf as during his transport of Mr. Espinoza he verbally accosted and abused him, telling him things such as "you're a piece of shit" and "fuck you, you worthless piece of Walsenburg dirt."

104.    Defendant Trujillo's failure to activate his body camera during his transport of Mr. Espinoza reflects not only a pattern violation of LACSD policy, but also C.R.S. § 24-31-902. Both LACSD policy and C.R.S. § 24-31-902 are designed to protect Substantive Due Process rights in Article II Section 25 of the Colorado Constitution.  C.R.S. § 24-31-902(1)(a)(III) creates a presumption that when an officer fails to activate their body camera during an investigation, that the missing footage would reflect misconduct by the peace officer.  As

alleged herein, Defendant Trujillo failed to properly activate his body camera during multiple interactions with Mr. Espinoza, specifically during transport after the incident on November 29th, 2022.  Trujillo's actions constituted a further violation of Mr. Espinoza's rights secured in Article II section 25 of the Colorado Constitution.

105.    Defendant directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, property damage, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.


### FIFTH CLAIM FOR RELIEF

### Fourth Amendment to the U.S. Constitution through 42 U.S.C. § 1983 –

### Municipal Policy and Failure to Train, Supervise and Discipline – Fourth Amendment

(Defendants LACSD, Navarette, Santistevan, and Board)

106.    Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

107.    In order to establish [a Monell claim for failure to discipline], [a p]laintiff must allege that the Departments had in place (1) a custom or policy of failure to discipline; (2) deliberate indifference on the part of the decision maker, and (3) a causal link to the constitutional deprivation.  *Estate of Holmes by and through Couser v. Somers*, 387 F. Supp. 1233, 1263 (D. Kan. 2019).  "Evidence of prior complaints can be sufficient to show that a municipal Defendant and the officials ignored the officers' misconduct."  *Id*.

108.    This is the second civil case in as many years against Defendants Trujillo and Noel

involving the use of excessive force, among other constitutional violations.  Despite

Defendant LACSD paying out a significant settlement for the actions of Trujillo and Noel, no

internal investigation was conducted in regards to their conduct, nor is it apparent that any

discipline, training or remedial measures were taken in response.  Given Santistevan's

response to Mr. Espinoza's CORA/CCJRA request that no complaints, remedial trainings or

internal investigations existed for either Noel or Trujillo, despite numerous documented

instances of Constitutional level misconduct, it is abundantly clear that the Board and

LACSD has a custom of failing to discipline its officers for their repeated misconduct and it

directly results in the violation of the Constitutional rights their deputies encounter, such as

here with Mr. Espinoza.

109.    In fact, LACSD, the Board, and Defendants Trujillo and Noel agreed to the above

referenced settlement just twelve (12) days before engaging in the conduct at issue in this

case.  This combined with the fact that Trujillo has three times previously been terminated

from the Las Animas County Sheriff's Department, as well as the City of Trinidad Police

Department, yet is now the 3rd in Command, is a clear display of institutional level disregard

for the Constitutional rights of the citizens and occupants of Las Animas County Colorado.

110.    Additionally, "[T]he inadequacy of police training may serve as the basis for § 1983

liability only where the failure to train amounts to deliberate indifference to the rights of

persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S.

378, 388 (1989); *see also Cullen v. Phillips*, 30 P.3d 828, 830–31 (Colo. App. 2001) ("Where

a municipality completely fails to train its police force or trains its officers in a reckless or

grossly negligent manner such that police misconduct is almost inevitable, liability may attach under § 1983."). To prevail on a failure to train claim against a municipality, a plaintiff must demonstrate that the training was inadequate and that "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

111.    The United States Supreme Court has indicated that a pattern of similar constitutional violations by untrained employees may be demonstrative of deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Stated differently, the "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cty. Comm'rs of Bryan Cty, Okla. v. Brown*, 520 U.S. 397, 407 (1997)). Moreover, the "existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*. at 407–08.

112.    Again, LACSD, the Board, and Defendants Trujillo and Noel agreed to the above referenced settlement just twelve (12) days before engaging in the conduct at issue in this

case.  It is clear that no remedial measures have been taken in regards to the repeated Constitutionally significant misconduct of Trujillo and Noel.  In any event, it is abundantly clear that even if any such training or measures have been taken, they have been wholly and completely ineffective as Trujillo and Noel continue to trample the Constitutional rights of the citizens they encounter. This combined with the fact that Trujillo has three times previously been terminated from the Las Animas County Sheriff's Department, as well as the City of Trinidad Police Department, yet is now the 3rd in Command, is a clear display of institutional level disregard for the Constitutional rights of the citizens and occupants of Las Animas County Colorado.

113.    Defendants' directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, property damage, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.

## SIXTH CLAIM FOR RELIEF

### Civil Action for Deprivation of Rights, Pursuant to C.R.S. § 13-21-131

### Article II Sections 7 and 25 of the Colorado Constitution- Malicious Prosecution

(Defendants Trujillo and Noel)

114.    Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

115.    Trujillo and Noel charged Mr. Espinoza with a litany of crimes, none of which had any

basis in law or fact:

    a.   2nd Degree Assault on a Peace Officer

    b.   Attempt to Commit 2nd Degree on a Peace Officer

    c.   Obstruction of a Peace Officer

    d.   Resisting Arrest

    e.   Reckless Driving

116.    When both officers began their interaction with Mr. Espinoza, they had absolutely no

legal justification for any level of detention, yet within three (3) seconds of ordering him to

leave the scene, and him doing so, both Trujillo and Noel resorted to the threatened use of

deadly force.  As fully described herein, both Noel and Trujillo then repeatedly, without

justification assaulted Mr. Espinoza.

117.    As fully discussed herein, Defendant Noel then filed an APC based on a wholly

fabricated version of events to justify not only the officers' use of force, but the charges

against him.  No probable cause existed for any charge against Mr. Espinoza, and as such the

District Attorney in the criminal case against Mr. Espinoza declined to file any charges

against him.  The criminal case against Mr. Espinoza was subsequently sealed.

118.    As a direct and proximate cause of Noel and Trujillo's malicious prosecution, Mr.

Espinoza suffered incarceration, bond supervision costs, travel and other expenses,

unnecessary legal expenses, and caused him physical and emotional pain and suffering.


**SEVENTH CLAIM FOR RELIEF**

## Civil Action for Deprivation of Rights, Pursuant to C.R.S. § 13-21-131

## Article II Sections 16, 18 and 25 of the Colorado Constitution- Right to Remain Silent

(Defendant Trujillo)

119.     Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

120.     While handcuffed in the back of Trujillo's police vehicle, Trujillo repeatedly demanded Mr. Espinoza give him information about himself.  Given the preceding assault and complete disregard for all of his cooperation, Mr. Espinoza politely stated to Trujillo that "he could take him to jail and speak with his attorney." This was a clear invocation of his right to remain silent as guaranteed in the Article II Section 18 of the Colorado Constitution.  Upon this statement, Trujillo went into a rage, screaming at Mr. Espinoza that if he did not give him the information he was demanding, he would charge him with additional crimes.  This was a clear and unequivocal threat from Trujillo to Mr. Espinoza in direct response to his invocation of his Constitutional rights.

121.     When Mr. Espinoza continued to exercise his rights pursuant to Article II Sections 16, 18 and 25 of the Colorado Constitution by remaining silent and telling Trujillo that he could speak with his attorney, Trujillo violently yanked Mr. Espinoza out of his police car, further assaulting him by slamming him on the icy pavement so that he could search Mr. Espinoza's person for his wallet.  Thankfully a third unknown Deputy had arrived on scene at that point and eventually helped Mr. Espinoza, who was still handcuffed behind his back, up onto his feet and back into the back of Trujillo's police car.

122.     Defendant directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.

**EIGHTH CLAIM FOR RELIEF**

**Civil Action for Deprivation of Rights-False Arrest, in Violation Article II Section 7 of the Colorado Constitution**

(Defendants Trujillo and Noel)

123.     Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

124.     When both officers began their interaction with Mr. Espinoza, they had absolutely no legal justification for any level of detention, yet within three (3) seconds of ordering him to leave the scene, and him attempting to do so, both Trujillo and Noel resorted to the threatened use of deadly force.  As fully described herein, both Noel and Trujillo then repeatedly, without justification assaulted Mr. Espinoza.

125.     Defendants' directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, property damage, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.

**NINTH CLAIM FOR RELIEF**

**Civil Action for Deprivation of Rights, Pursuant to C.R.S. §13-21-131 and 42 U.S.C. § 1983**

**Article II Section 10 of the Colorado Constitution, First Amendment to the U.S. Constitution– Retaliation of Right to Record and Observe Police Action**

(against Defendants Trujillo)

126.    Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

127.    "Filming the police performing their duties in public is protected activity." *Irizarry v. Yehia*, 38 F.4th 1282, 1288 (10th Cir. 2022). "To state a First Amendment retaliation claim, a plaintiff must allege facts showing (1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

128.    Here, Trujillo retaliated against Mr. Espinoza for observing and recording the police activity involving his son.  The very first statement Trujillo made to Mr. Espinoza was "Do you need to be behind this traffic stop?"  When Mr. Espinoza answered that the stop involved his son, Trujillo responded that "we don't like it when people pull in behind us," and then told Mr. Espinoza "you need to leave or you are going to get charged."  Mr. Espinoza then stated that he was recording the incident.  Then, the ensuing assault as fully discussed herein occurred.

129.    When Trujillo first approached Mr. Espinoza, he had committed no criminal or traffic offenses, he was merely observing and recording the traffic stop involving his son.  Trujillo

clearly disliked this, and unequivocally said so.  Trujillo proceeded to make good on his promise to Mr. Espinoza that if he did not leave, he would get charged, as that is exactly what happened, despite Mr. Espinoza attempting to leave the scene in accordance with Trujillo's demand.  Trujillo and Noel then viciously assaulted Mr. Espinoza, including tasing him.

130.   Mr. Espinoza was engaging in Constitutionally protected behavior when he stopped to observe and record the traffic stop involving his son. It is no doubt that what Trujillo and Noel did to Mr. Espinoza would chill an ordinary person from continuing to observe and record any police action in Las Animas County, for fear of being brutally assaulted by the involved officers. Finally, it is clear that Trujillo's assaultive and unlawful actions were substantially or even entirely motivated by Mr. Espinoza stopping to observe and record the traffic stop, because as discussed above, he expressly told Mr. Espinoza so.

131.   Defendant's directly and proximately contributed to Mr. Espinoza's unconstitutional search and seizure, and directly and proximately resulted in his incarceration, bond supervision costs, property damage, travel and other expenses, unnecessary legal expenses, and caused him physical and emotional pain and suffering.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for such sum that will fairly and adequately compensate Plaintiff for his damages, injunctive relief, punitive damages, and for

such other and further relief as the Court deems just and proper under the circumstances, and for his attorneys fees, costs incurred and expended.

Plaintiff requests a jury trial.

/s/ Kevin Mehr
**KEVIN MEHR, #49108**
Mehr Law PLLC
Kevin.mehr@mehrlawcolorado.com

Dated:  April 29, 2023